Case number 22-7150. Saad Aljabri, Dr. Appellant v. Mohammed bin Salman bin Abdulaziz al Saud. Ms. Harrison for the appellant, Mr. Kellogg for the appellate. May it please the court, good morning. Lindsay Harrison from Jenner and Block for the plaintiff appellant, Dr. Saad Aljabri. This case involves an effort to hunt, target, and kill Dr. Saad Aljabri, the key Saudi intelligence partner of the United States since 9-11. The district court dismissed the case largely on personal jurisdiction grounds, and I hope we'll focus this morning on that. But let me start with immunity, which arose after the case was decided in the district court, and make two points on immunity that I think will help guide the court. So the first point is that regardless what the court does with respect to bin Salman, it has no impact on the case against Bader al-Assad and all of the other defendants, all of whom participated in a scheme to target and kill a key US intelligence asset by hunting for him on US soil. And we'd ask the court to focus particular attention on Bader al-Assad, who directed the hunt for Dr. Saad in the United States. So are we assuming that you're essentially waiving your argument about the status-based immunity with respect to bin Salman? No, Your Honor. We press those arguments, but I think on that issue, there's something that the court could do that would help clarify things, and that's call for the views of the United States. And the United States has not spoken yet in this case. They filed a suggestion of immunity in a different case. And let's talk about that. It did say, this case. And so I know you're focusing on those words, but if you read the rest of the opinion, it also states that the immunity is allowed while in office. Yes, that's the time period. But what happens is that the United States files suggestions of immunity and has said again and again that it reserves the right to take a different position on immunity, status-based immunity, in different cases. And so that's why I think calling for the United States to come in and tell you what they think is better than saying that the court simply lacks the authority to answer the question, because in a different case, the United States filed a suggestion of immunity. I mean, the court has, I mean, the head of state immunity turns on common law where there's been no suggestion of immunity from the government. And so it's certainly within the authority of the court to determine that Mr. Binsolman is immune. Yes. You're not suggesting that that's outside the scope of our authority. No, not at all. What I'm saying is, I think my friends have argued that because a suggestion of immunity was filed in a different case, that this court has no discretion and has to say that he's immune. And what I would say is the United States has not come in in this case. Even if we have discretion, I mean, why wouldn't we defer to the previous suggestion of immunity in a different case? Well, why wouldn't we consider that to be highly probative evidence in making our own independent determination? Oh, I think it would be evidence that the court obviously could consider. I think we have, I think, two good reasons why it's not decisive. One is that the United States hasn't come in here. And they also haven't revoked their previous suggestion of immunity. Right, and well, it wasn't filed in this case, so it would be, that case is done. So there's just sort of, there's no live controversy in which they would evoke that suggestion of immunity, but they have been silent here. I think that silence could be telling, particularly because it's a different plaintiff who has a very strong relationship with the United States intelligence community. And then the second reason is that that suggestion of immunity was filed very, very quickly after the appointment was made. And it's now been two years. There've been a whole series of meetings, cabinet meetings and so on, that have been chaired by the King, not by Ben Solomon. And so I think that would be considered probative. But I think the way to make this easier is to call for the views of the United States. It can do no harm for the United States to come in and tell you what they think. Could make it very easy if the United States says that they believe he is immune. And it could be quite probative if the United States says that they're not going to take a position in this case. How do we do that? Or are you suggesting a remand to the district court to do that? No, I think this court could call for the views of the United States and then could decide that question. And then in the meantime, the court could reach the jurisdictional questions, which I think the district court aired, regardless of what you think with respect to immunity. For the views of the United States. I mean, what evidence has the appellant put forward that suggests that there wouldn't be head of state immunity here? So number one is the fact that Ben Solomon has asked the United States to come in and the United States has been silent. And number two is the evidence that we cite in our brief about the way that the appointment was purely nominal and how in fact, the King remains both head of government and head of state, as he retained for himself the authority to chair cabinet meetings. And the only time Ben Solomon is actually functioning in any way as head of government is when the King is not there, which means he's not head of government. But I agree that there are very substantial separation of powers, comedy, and other issues that make it a hard question, no doubt. And that's why I think if you ask the United States to come in on it, it can make it a much easier issue for the court to decide. But in the meantime, I think our personal jurisdiction argument remain extraordinarily strong, even if Ben Solomon is not in the case. And the district court's error with respect to personal jurisdiction was really discounting allegations and not accepting them as true and sort of not looking at the complaint as a whole. And here, I think there are three key pieces of evidence the district court ignored or discounted. The first is that within five days of both Ben Solomon and al-Assad personally pressuring Dr. Saad to return to Saudi Arabia, strangers who had never before been known to Dr. Saad's family, start looking for members of his family in the United States. At least four people who are previously unknown to the al-Jabri family, start asking, where is your son? Where is your wife? We're looking for you. The timing of all of those things right after al-Assad and Ben Solomon have said, where are you, come back here, is very suspicious. Second is at the very same time that all of these Saudi strangers are looking for the members of the al-Jabri family in the United States, Dr. Saad's son-in-law in Saudi Arabia is being tortured and he is being asked, where is Dr. Saad? This is all happening simultaneous with these strangers looking for him in the United States. And third is that in viewing these very same facts, the FBI concluded that Dr. Saad was in danger and conveyed that it was itself investigating the hunt for Dr. Saad and that he should be on alert that he is in danger. The FBI does not use its limited resources to investigate the implausible. Those three facts, the district court discounted and said, well, this just seems like innocent people looking for someone to get in touch with them. But when you look at all of those things together which the district court didn't do, we think that demonstrates quite plausibly a hunt in the United States on US soil for Dr. Saad with the aim of killing him. Go ahead. I'm interested on this question of whether there should have been more jurisdictional or the district court should have allowed jurisdictional discovery. So the district court did not. And I guess I'm interested to understand why you think that was an abuse of discretion because there were a number of points. I mean, even if some limited jurisdictional discovery could show minimum contacts, the district court thought that it wouldn't comport with traditional notions of fair play and substantial justice. So where's the abuse of discretion? So the abuse of discretion is in the fact that I think jurisdictional discovery would have demonstrated an even stronger connection to the United States and to action that took place on US soil, which I think is part of the balance of factors that a district court considers in making that judgment about whether exercising jurisdiction comports with fair play and substantial justice. I think if there were more contacts, there were more, you know, if discovery showed that there were more contacts with the United States, that would affect the fair play and substantial justice problem. That's correct, Your Honor. And I think that has to be right because the interest of the United States in having jurisdiction over the dispute is part of that analysis. And if, for example, the defendants were sent on land through the United States in order to get to Dr. Saad and kill him, the United States obviously has an extraordinarily strong interest in retaining jurisdiction over disputes in which foreign actors are sent through our borders in order to kill our intelligence partners. And I think the fact that the district court sort of assumed the answer to the fair play and substantial justice test without considering whether discovery would be probative of any of the factors was an abusive expression. But how do we get beyond this being kind of inner politics? I mean, you got the Saudi against the Saudi government and we're required to look at personal jurisdiction from the standpoint of very strong U.S. interests. And I know you're indicating some connection with the intelligence community, but on the Kastogi matter, much stronger, they are in terms of how the U.S. supported that particular assassination essentially. So, well, so let me answer in two parts. So the first part of the question I think is about, is this about the Saudi prince wanting to solidify his stand in Saudi Arabia as opposed to in the United States? And I think the answer to that is that bin Salman's path to the throne went through the United States and the complaint goes in exhaustive detail, I think explaining why that is. He told Jared Kushner that he had very strong relationships with the United States except with the intelligence community. That's at paragraph 161 of the amended complaint. And then what the complaint does is it goes through a series of events where it shows that in bin Salman's mind, Dr. Saad was the person standing in the path to his fortifying those relationships with the intelligence community. So the first example of this is the 2015 meeting with the CIA director, John Brennan. There were two meetings that Dr. Saad had and immediately after that, bin Salman ordered him removed from his official position. Second is that there's a May 2017 Politico article that reports a lobbying contract between someone in Saudi Arabia and a U.S. lobbying firm to the Trump administration. And that led al-Qahtani to order the arrest of the man in Saudi Arabia who signed that contract. And the captors asked that man directly, was Dr. Saad involved? What is his relationship to this contract? And then the third is that the U.S. investigation into the murder of Jamal Khashoggi is actually what the complaint alleges prompted the Tiger Squad to enter Saudi Arabia 13 days later after the Khashoggi killing in order to try to get at Dr. Saad. And I guess that's what I'm getting at. Where's the real U.S. presence here in this case in terms of it showing its interest, not you kind of parading through the chronology to get us to the interest? Right, so this case is quite different from a case like Livnat or Bhutan because here you have both targeting of the United States and also conduct taking place on U.S. soil. So you have the whole hunt for Dr. Saad took place in the United States, in Boston, in D.C., conversations in New York that are aimed at trying to find him for the purpose of killing him. And that is the kind of conduct that should cause a defendant to not be surprised when he is hailed into court in the United States. When you're looking for someone to kill him on U.S. soil, you should be expected to enter in a U.S. court. But in addition, there was targeting, and it's not so much that the United States has to demonstrate an interest in Dr. Saad, it's that that strong relationship is what the defendants believed they were targeting in trying to get Dr. Saad and capture him. And I think actually the best evidence of that is probably the Mudd Declaration, which the district court didn't even address in its opinion at all. And that's at JA 292 is probably the best evidence in the Mudd Declaration, that's paragraph 28. And that's a former CIA official who's explaining why it is that bin Salman would target Dr. Saad, and to try to fortify his own standing with the United States government and the intelligence communities in the United States. But if he's ultimately found on Canadian soil, how does that help your argument or hurt it? So I think what matters is not where he's ultimately found, but how he's found. And one way to think of it is if the Tiger Squad had come to the United States and purchased weapons here, pools of dismemberment, which they ultimately brought into Canada, I think there would be no question that the conduct on US soil would be seen as related to the scheme. What happened was instead the equivalent of finding a map in the United States that led these defendants to Dr. Saad in Canada. And I think purchasing a map or finding a map, developing it and finding him in the United States is just as closely tied to the conduct, just as related to it as finding a weapon here that one would use to take into Canada. And so I think that because the path to Dr. Saad went through US soil, there's an extraordinarily strong tie between the United States and this dispute. And it's the combination of that US soil conduct with the targeting the United States is most important intelligence partner from Saudi Arabia since 9-11, the person whose relationships threatened Bin Salman and his team. That are the reason why none of these defendants should be surprised to find themselves answering in a US court on these claims. See if there's any questions. Okay, thank you. Thank you, Judge Rao and maybe please support. My name is Michael Kellogg. And although I represent the Prime Minister Bin Salman, for purposes of this argument, I'm also speaking on behalf of the other four defendants who would make the case, two students and the two Saudi officials. So on status-based immunity, it was as close to a concession as one could expect that the case is absolutely clear that the State Department has said that as the Prime Minister, the sitting Prime Minister of the Kingdom, he is immune from suit in US courts, which is the language they use. Why didn't the State Department simply enter a suggestion of immunity in this case? Well, they had already addressed, entered a statement of immunity in the Sengiz case.  It's pretty common for the government to issue multiple statements of immunity. It is also common for them to issue a single one that's used repeatedly in other cases, which is the fact here. It's important to understand the timing. When they issued the statement of immunity in Sengiz, Judge Kelly had already dismissed his case on personal jurisdiction grounds. So there was no need for the United States to enter a new one after the case had already been dismissed. But in this case, and even though it says you get the immunity while in office, why was it necessary to use those words? But I'm just saying, piggybacking on Judge Rao's question about continual suggestions of immunity, it seems like they would want to be notified, the inquiry made for the particular case, so that they're speaking on those facts and circumstances in the individual case. If you take the nature of status-based immunity, which is based on your status, the fact that he retains the same status today and throughout is a sufficient reason to recognize that in all cases. And that seems perfectly fine, but I just wonder what do you place on the emphasis of the words, this case? I emphasize what precedes that, which is that he enjoys head of state immunity from the jurisdiction of U.S. courts, general U.S. courts. And then he goes on and the State Department explained, the termination has nothing to do with the merits of this suit, but there's no qualification of the recognition of immunity. It's merely saying, this is not a merits-based determination. This is a determination based on status, which has not changed in the interim. So the United States has already spoken to this issue. And despite knowing about this case and the dismissal of this case, is specifically said from U.S. courts without any qualification. So I think there's nothing to be remanded for nothing else to be sought. So if it's okay, I'll turn personal jurisdiction. I have a question about the jurisdictional discovery. So Dr. Saad or Dr. Aljabri, he's alleged that Bin Salman and the defendants have operated effectively networks in the United States through the charity and through other events. And that those actions were related to the plot against him. So why shouldn't there be further discovery to see whether it can be substantiated? Well, Judge Kelly was perfectly within his broad discretion on the issue of discovery, but part of that had to do with merits of the claims or the conclusory nature of the claims. There were no factual allegations connecting the prime minister or Al Qahtani to the students who were alleged to have done the searching. There are no allegations that the prime minister, Al-Osakar, Al-Qahtani, communicated with any of those individuals, had any intermediary communicate with those individuals or directed them to do anything with respect to Al-Jabri. No indication that the prime minister and Al-Qahtani even knew who they were or had ever met them. All they have to tie them to one of the defendants is Al-Osakar is that one of the students was at an event, a MISC event at which Al-Osakar was also president, got his picture taken with. So that's hardly a basis for making the leap. Our standards for jurisdictional discovery are pretty plaintiff-friendly in this circuit. Well, first of all, it has to be narrow and targeted. And Judge Kelly said this was broad and overreaching. And if you look at the district court's opinion at 8-330, he explains how broad and unconstrained. But the solution to overly broad discovery request is to narrow the discovery request, not to deny them- This court has repeatedly said it's not its obligation or the obligation of the court to narrow discovery requests made by the plaintiffs. But in any event, he said it's unwarranted because the plaintiff's allegations are based solely on conjecture and speculation. There's no- If it's a clandestine operation, you can only get so far into knowing what's actually going on in a particular conspiracy, as alleged, because not everybody in the conspiracy will know everything that's going on in the conspiracy. And so you've got, what, over 400 allegations or so in the complaint that they're raising as close to what they know, but they're asking for jurisdictional discovery to make that complete tie. There are over 400 allegations, most of which have nothing to do whatsoever with these alleged targeting of Al-Jabri in the United States. And indeed, if you look at what the students actually did, one of them asked Al-Jabri's son what his immigration status was. Another was going to London and wanted to get together with Al-Jabri's wife to have lunch. So from that, from those sort of innocuous contexts, they make the leap to saying this was an elaborate scheme to track down Al-Jabri in the United States, even though he wasn't in the United States, he was in Canada. And it did not have any result because, as the complaint itself admits, nobody tracked him down. None of these students tracked him down to Canada. They had no clue where he was and they never asked anybody where he was. There's not a single incident which any one of these four students asked about his whereabouts. And the only reason the complaint said he was ultimately found is that one of his former colleagues, Al-Harbi, went to, who's not a defendant in this case, went to see him in Toronto and talked with him. And then his phone was tapped, which allowed a precise targeting where he was in Canada. None of that has anything to do with these four students who engaged in wholly innocuous behavior that does not spur a contention that there was a widespread conspiracy. Essentially, they say any Saudi student in the US must be being surveilled by and guarded by and controlled by Badr al-Sakr and Saud al-Qahtani, even though there was no evidence whatsoever in that respect and nothing in the complaint that details any such context. So, as far as jurisdiction- I mean, I've seen a number of the district court's determinations turn on the fact that asserting jurisdiction over these defendants would be fundamentally unfair. So assume, for the purpose of this question, I mean, so if I disagree with that conclusion, then does there have to be further discovery to see if there are minimum contacts? Because, I mean, it seems that the district court's bottom line is this would be fundamentally unfair. And if this court disagreed with that conclusion, then wouldn't there need to be further discovery? Because he actually gave three reasons. One of them, as you say, was after he walked carefully through the Asahi factors, said the burden of having a suit proceed against the head of a foreign country and being forced to answer deposition, discovery, et cetera. Put the head of state, you know, put Mr. bin Salman aside. Mr. Al-Qahtani and Dr. Al-Sakr are also high-level Saudi officials. And the students, there's no indication that they know absolutely anything. And walking through the Asahi factors was well within his discretion to say it's a bridge too far and it would damage relations between the United States and its close ally, Saudi Arabia, by the tensions, the inherent tensions in forcing them to participate in litigation in the United States. So that's only one of the reasons. The second was that there was no indication, no non-conclusory allegations, and lots of words like targeting, tracking, stalking, but there's no actual allegation of any specific instructions that anyone was given to try to track down al-Jabari and no basis for jumping to that conclusion when all the actual interactions were innocuous. Further questions? Judge Rogers, any questions? No, thank you. Thank you. Thank you. Thank you. I think Judge Child's point is correct, that the whole point of a scheme like this is to have plausible deniability between various defendants. And the complaint contains allegations from which at a minimum, the court should conclude that there's a good faith basis for us to seek jurisdictional discovery. Those are, number one, that these students were receiving unusual benefits that were reserved for those carrying out covert tasks in the United States. That's at paragraph 15 and 35 of the amended complaint. Number two is that they had no reason to be looking for Dr. Saad's family members, but were doing so at the very same time that Dr. Saad's son-in-law was being tortured in Saudi Arabia, and that the FBI concluded this was suspicious. Number three is that they were working directly with and receiving instruction from al-Staker. That's paragraph 236 of the amended complaint. And number four is that this had happened before. What is the allegation about that specifically, that they were receiving direction? So there's two reasons we believe that to be true. Number one is that they appeared in the same place at the same time at the NISC events. And number two is that al-Staker played this exact same role in the scheme to infiltrate Twitter with Saudi former students who were in the United States. And that's the Abu Amo case that's cited in the complaint. It's a criminal prosecution for the attempted infiltration of Twitter, where al-Staker played exactly the same role. His function in leading this NISC foundation was to create sort of an appearance of something innocuous, but to use that presence in the United States to cultivate agents to carry out tasks for the administration within the United States. And I think the fact that the Department of Justice found that plausible enough to prosecute in the Abu Amo case, the fact that the FBI was suspicious and warned the al-Jabri family about it here, and the fact that these were strangers who did not know the family who at the very same time that the son-in-law of Dr. Saud was being tortured in Saudi Arabia, they were asking about members of the family in order to locate them. And then lo and behold, people who know each other suddenly end up at the apartment in Boston where the address was unknown, it was not publicized. It shows that these people were talking to one another, sharing information. And we believe because of the role al-Staker consistently played that he was the hub that was connecting these folks to one another. And let me just close by saying that I think the Jamal Khashoggi conspiracy would seem just as innocuous if it didn't end with a successful kill. He was told go to the embassy for immigration reasons in Turkey. And the way that ended was with a murder by the very same actors using the same tools and the same methods. We would ask the court to reverse and at a minimum order jurisdictional discovery so that we can make our case. Thank you. Thank you. Case is closed.
judges: Rao, Childs, Rogers